IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DAWN HERINGTON, *Individually and as*
*Mother and Next Friend of B.D.J.L., minor*
*Child and Heir-at-law of* TROY LANNING II,
*Deceased, and as Special Administrator of the*
*Estate of* TROY LANNING II, *deceased,*

        Plaintiffs,

v.                                 Case No. 6:14-cv-01094-JTM

CITY OF WICHITA; and
RANDY WILLIAMSON,

        Defendants.

## MEMORANDUM AND ORDER

Plaintiff filed this action after City of Wichita Police Officer Randy Williamson shot and killed Troy Lanning II following a high-speed vehicle pursuit and a chase on foot through a neighborhood. Plaintiff contends the use of deadly force was unjustified. Williamson contends he reasonably believed that Lanning was armed and that he was attempting to point a weapon at him at the time of the shooting. Subsequent investigation showed that Lanning was carrying a bag with several items in it but was not armed at the time of the encounter. The matter is now before the court on summary judgment motions by Williamson and the City of Wichita.

For the reasons set forth herein, the court finds that the defendants are entitled to summary judgment on plaintiff's claims under 42 U.S.C. § 1983. And in view of the dismissal of all of the federal claims brought by plaintiff, the court concludes it should

refrain from exercising jurisdiction over plaintiff's claims based on state law, and that the state claims should be dismissed without prejudice.

### I. Uncontroverted Facts.

At the outset the court notes it has been difficult to determine the uncontroverted facts in this case. The parties' asserted facts and objections are highly contentious, and many of the asserted facts are based on inadmissible hearsay or suffer from other defects. Plaintiff has vigorously challenged a number of defendants' asserted facts, only to include a number of the same facts in her own statement. The court has done its best to determine what facts are uncontroverted and material under the standards of Rule 56.

At the time of the incident, Randy Williamson was 30-years old. He had been a City of Wichita Police Officer for approximately 9 years. On March 31, 2012, at about 11:54 p.m. [23:54 hours], Williamson and two other police units responded to a possible drive-by shooting call on 46th Street south of Charles Street, in Wichita, Kansas. Williamson was about two miles away when he heard the dispatch.

The following is a transcription of the radio broadcast from the police dispatcher.

Dispatch ("D"): 21, 22, 28 possible drive-by 46th street south of Charles. 46th street south of Charles. No vehicle description. Vehicle speeding away after hearing four to five shots.
***
D: Just got a description. It's a white four-door sedan. They're eastbound. Heard four to five shots one block away. And just prior to the shots saw two juveniles messing with a vehicle.
***
D: They were eastbound on 45th, 4-5.
***
D: So far this is the only call we have.

\*\*\*

D: Reference to the shots, they were fired one block to the east of Charles. So, Vine… or Glenn actually. Number one, Hispanic male, 16 to 17 years old, wearing all black, 5-5, medium build. No description on the second subject.

The radio broadcast differed slightly from the "CAD [Computer Aided Dispatch] Printout" provided contemporaneously to Wichita officers on computer terminals mounted in their patrol vehicles. Included in the CAD entries that night were statements that the "CP [complaining party] ADV[ised] THAT SHE CAN SEE 2 KIDS MESSING WITH VEH[icle]," "THAT SHE JUST HEARD 4-5 GUNSHOTS ON THE NEXT BLOCK OVER," that she "HEARD THEM TOWARDS THE EAST," THAT IT POSS[ibly] SOUNDS LIKE IT CAME FROM A VEH[icle] THAT DROVE BY SPEEDING," which was a "WHITE, 4 DR [door], SEDAN, UNK[nown] TAG." It said the suspects left going east on 45th street, and that "SUSPECT 1 IS H/M [Hispanic male], 16-17 YO[years old]," and "ALL BLACK [clothing of suspect]2 …DIDN'T SEE VERY WELL."   A transmission at midnight [00:00:17] stated "NO WEAPON ….. EMS NOT NEEDED" and shortly thereafter: "VEH[icle] WAS LAST SEEN GOING NORTH ON GLENN."

Williamson approached the area in his marked police vehicle, driving east on 46th Street, arriving several minutes after dispatch reported the possible drive-by shooting. Williamson did not think he would see the suspect vehicle because it was reportedly headed east and then north, and he was coming from the west. At a stop sign at Clarence and 45th, he observed a white four-door SUV turn west onto 45th Street from Glenn, one block east of Charles. As it passed him, Williamson illuminated

3

the car with his alley light and saw the silhouettes of several individuals. Williamson thought the driver was a white male with tattoos, black sleeves, and black hair. He did not appear to be a teenager.

Williamson recognized that the car was a white SUV, not a white sedan, but decided to check it out to make sure it was not involved in the shooting. He did so in part because he believed eyewitness reports on such details were often mistaken. He made a u-turn to follow the SUV on 45th Street. The SUV accelerated to about 70 miles per hour on 45th Street towards Meridian Street. The posted speed limit in that area was 30 mph. Williamson concluded the vehicle was attempting to elude him, and he activated his emergency lights and siren as he went through the stop sign at 45th and Meridian. Shortly after this, Williamson was able to get close enough to read the license tag, which he relayed to dispatch. He notified dispatch that the vehicle was fleeing and that he was in pursuit northbound on Meridian approaching MacArthur Street.

Williamson pursued the vehicle at high speeds with his lights and siren activated. He radioed pursuit information during the chase as follows: "Speeds 80, traffic light, occupied five," approximately 25 seconds into the pursuit; "130 MPH, traffic still light" at 66 seconds into pursuit. At three minutes twelve seconds into the pursuit, the dispatcher advised that the vehicle had a stolen license plate. Williamson reported that traffic was moderate and civilian vehicles were pulling over, but the SUV was "weaving in and out" of traffic. For approximately seven minutes, the pursuit continued at high speeds through commercial and residential streets. Other WPD officers responded during the pursuit.

4

The pursuit ended when the SUV was unable to make a turn at the intersection of Everett Street and 35th Street South. The vehicle attempted to turn left (east), but jumped the curb and came to a stop off the shoulder of 35th Street.

By the time Williamson turned the corner, he saw that the occupants had all exited the vehicle. He saw two people "bailing" and running from the vehicle: a heavy-set white female wearing a hooded sweatshirt and blue jeans; and a white male in a blue t-shirt and light colored pants. The male was running northeast and was carrying a black bag with a reflective stripe on it. The man was later identified as 24-year old Troy Lanning II. The female was eventually identified as Meagan Tindle. [1]

Williamson initially remained in his patrol car as he followed Lanning. Lanning turned the corner, running north on the west side of Bennett Street. Williamson drove his vehicle across the front yard of the corner house and stopped in front of 3543 S. Bennett. Lanning turned west on the north side of that address and fled through the side and then the back yard. Williamson got out and pursued Lanning on foot.

Lanning angled towards the southwest as he ran through the backyard of 3543 S. Bennett. Williamson had his handgun in his right hand and his flashlight in his left hand as he illuminated Lanning with the light. Williamson estimated he was about

---

[1] Plaintiffs attempt to controvert the allegation that Lanning was carrying a bag by asserting that a neighbor who looked out through his screen door testified that he saw a man followed by an officer running through his back yard, but he did not see a bag. But plaintiffs cite no evidence that the neighbor likely could have seen a bag. When asked if he had seen a bag, the neighbor responded, "No, I did not. It's pretty dark out there at the time." Nor does plaintiff cite any other evidence from which a jury might reasonably infer that Lanning did not have a bag. Williamson testified he saw the man carrying a bag; a bag was found under Lanning by other officers moments after the shooting; and Tindale testified that she remembered Lanning or the driver (Billy Brown) grabbing a bag when they took off from the SUV. In sum, plaintiff cites no evidence from which a jury could reasonably infer that Lanning was not carrying a bag at the time of the incident.

thirty feet behind Lanning. He yelled for Lanning to stop. Lanning looked over his shoulder at Williamson but continued his flight, climbing over a privacy fence into the backyard of 3544 S. Everett.

Williamson testified the bag Lanning was carrying appeared to have some weight to it and it made a "thud" against the fence when Lanning climbed over it. Williamson testified that Lanning's failure to abandon the bag and the fact that a drive-by shooting call preceded the chase caused him to worry that Lanning had a gun in the bag.

Williamson went approximately 15-20 feet north of the spot where Lanning climbed over the fence and peered over the fence. He saw Lanning running away from the fence, so Williamson climbed over to pursue him. Lanning started toward the northwest but then ran towards a gate at the southwest corner of the back yard at 3544 S. Everett. He still had the black bag in his right hand. (The approximate path taken by Lanning is depicted on Dkt. 173 at 17).

Lanning slowed almost to a walk as he reached the southwest corner of the back yard of 3544 S. Everett. Williamson approached and repeated his command to Lanning to stop. The owner of the house at 3544 S. Everett, Dale Geist, was looking out into his back yard through a screen door. He saw Lanning running through his yard with an officer in pursuit. Geist heard the officer yelling "stop," and he shut the back door as the man who was fleeing came within ten or fifteen feet of the door. When he did so, he

"heard the officer yell instructions. You know, put it down or get down. I can't recall which one. And then the shots." Dkt. 163-10 at 3."[2]

The following is Williamson's version of the shooting. Williamson testified that Lanning stopped with his body facing away and looked back over his right shoulder at Williamson. Williamson said that despite repeated commands to Lanning to drop the bag and show his hands, he saw Lanning move the bag from his right hand to his left hand and then stick his right hand inside the bag. Lanning rotated to his left (counter-clockwise) with his hand apparently in the bag and began to bring the bag up toward Williamson, with his arms and hands out in front of him. Williamson testified he could see something pressed up against the corner of the bag. He said he believed Lanning had a gun in the bag and would shoot him through the bag. Williamson estimated he was about 10-15 feet away from Lanning. Before Lanning completed his turn and before he could level the bag at Williamson, Williamson started firing toward the center mass of Lanning's back, firing five shots as fast as he could pull the trigger. Lanning fell face down on top of the bag. According to Williamson, Lanning fell more or less perpendicular to him. Williamson testified that Lanning immediately began to roll onto his right shoulder, and again brought the bag towards him. Williamson fired three more shots at the back of Lanning's upper torso.  Williamson estimated there was less than a

---

[2] Plaintiff cites no admissible evidence to show a genuine issue of fact on this point. Geist later conceded it was possible he was "misremembering," Dkt. 163-10 at 5, but plaintiff cites no evidence from which a jury might rationally conclude that Williamson did not give any such instruction. Plaintiff relies in part on evidence of an unsworn statement Geist gave a few hours after the shooting. But aside from the fact that the unsworn statement is not competent proof on summary judgment, the statement itself does not actually contradict Williamson's version, as the neighbor's statement at that time was merely that after the officer came over the fence, he "hear[d] some more – more yelling. I couldn't make it out. And then I heard gunshots." Dkt. 162-7 at 15.

second between the first volley of shots and the second. He said he does not remember moving during the shooting. According to Williamson, at that point Lanning rolled back on to the bag, prompting Williamson to yell again, "Show me your hands." Williamson said Lanning brought his hands out from under himself and tried to push himself up, but he fell back down, face down, on top of the bag.  Williamson testified that the only time Lanning faced him was before the shots, when Lanning looked over his shoulder at Williamson.

Officer Clayton Schuler, an eleven-year police veteran who had previously partnered with Williamson, heard and responded to Williamson's radio broadcast that a vehicle was attempting to elude him. Schuler was in the next car behind Williamson in the vehicle chase. Schuler stopped his car just north of Williamson's car near 35th and Bennett about 30 seconds after Williamson radioed that people were bailing out of the SUV. Schuler heard shots just after he got out of his car. He immediately [at 00:08:01] reported that fact on his radio. The CAD record shows that 60 seconds passed from Williamson's broadcast that he had started foot pursuit until Schuler's report of shots being fired. Schuler entered the back yard of 3544 S. Everett by climbing over the fence. Schuler saw Lanning lying face down. He appeared to be deceased.

Lieutenant Scott Heimerman, a 24-year police veteran, heard the radio dispatch about a shooting and Williamson's report of a vehicle pursuit. He responded and was in the third vehicle in the chase. He stopped his car near 35th and Everett. As he was getting out, he heard Schuler's radio report of shots being fired. Heimerman had not heard the shots. Heimerman ran toward someone yelling to the north and could see a

8

flashlight on the other side of a privacy fence. He thought it was Williamson and that he was giving commands to the effect of "show me your hands." Heimerman identified himself to Williamson and entered the backyard through the gate. Schuler and Heimerman each recalled in their later depositions that they were the first one to arrive after the shooting. Either way, they arrived on the scene within a very short time of each another.

Heimerman saw Lanning laying on his stomach with his hands out to the side. Williamson had his gun out and told Heimerman to "watch him" [Lanning] because he "still has a gun underneath him." Schuler testified that he also recalled Williamson saying that Lanning had a gun. Heimerman concluded that Lanning posed no threat at that point. Heimerman's recollection is that he could see a portion of a bag sticking out from under Lanning near his waist, and he slid the bag out and checked Lanning's waistband. Williamson testified that he thought that he [Williamson] was the one who pulled the bag out from under Lanning. The bag was a drawstring type of backpack. Heimerman testified the bag had some weight to it. He did not look inside of it. Heimerman found no pulse on Lanning and saw no movement.  He went around to the front of the house to get the address and called for EMS.

The contents of the bag, as shown by a subsequent inventory, were: (1) a BENQ external hard drive; (2) an HTC Verizon cell phone; (3) a plastic case with one SD card and one SD adapter; (4) power cords/adapters; (5) a tube of A&D cream; and (6) a purple Royal Crown bag containing: (a) a digital scale with stickers on it, and (b) clear

plastic baggies (empty). No gun was found at the scene and there is no evidence that Lanning had a gun.

Lanning died on April 1, 2012. Dr. Jamie Oeberst, then the District Coroner for Sedgwick County, performed an autopsy. She concluded Lanning died of multiple gunshot wounds. He had been shot six times. The wounds and direction of the bullets were as follows:

(1) Gunshot wound, front to back and slightly upwards, to Lanning's right cheek, with the path of the wound into the soft tissues of his cheek and then between the ear and skull, exiting behind the ear. This wound is consistent, in Oeberts's opinion, with Lanning's face being turned or situated toward the shooter.

(2) Gunshot wound into top of Lanning's right shoulder down into his body and ending in the right side of Lanning's chest. This wound is also consistent with Lanning facing the weapon either while falling or bending forward.

(3) Gunshot wound into the front of Lanning's right thigh, which passed through and exited the back of his right thigh, traveling slightly left to right (i.e., towards the center of the body).

(4) Graze gunshot wound across Lanning's back, right to left, that came to rest in Lanning's subcutaneous tissues.

(5) Gunshot wound into the left side of Lanning's upper back, going back to front, and left to right and downward, which perforated the ribs of the left side of the back, the left lung, the sac surrounding the heart, the heart itself, and came to rest in the left side of Lanning's chest.

(6) Gunshot wound into the left side of Lanning's upper back, going back to front, and left to right and downward, which perforated the ribs, diaphragm and liver, and came to rest in Lanning's stomach.

Williamson testified as to his belief that Lanning was turning around at the time the shots were fired and was never directly facing him. The shot that struck Lanning's cheek, however, indicates that Lanning in fact faced Williamson at some point during the shooting.

During the investigation of the shooting, eight shell casings were located in the backyard where the shooting occurred. A diagram of their location indicates that the greatest distance between two casings was about 15 feet.

Plaintiff contends a photo of the backpack (Dkt. 152-11) at the scene shows that it was closed and that this casts doubt on Williamson's claim that Lanning stuck his hand inside the bag. Defendants dispute this characterization, arguing the picture "shows the bottom of the bag, with the top of the bag (its opening) face down on the ground." Dkt. 173 at 37. The picture itself is equivocal and could lend support either way; its import might depend on further examination of the bag. Crime Scene Analyst Staci Unruh's report stated that "the black backpack was opened so its contents could be checked." Given the standards governing summary judgment, the court concludes that a reasonable jury could find that the backpack was closed when it was collected at the scene.

Williamson was involved in a total of nine shootings as a WPD officer. Six of those involved the killing of vicious dogs. In an incident in 2008, Williamson claimed

that a sniper shot the lapel microphone off of his shoulder while Williamson was moonlighting at the Wichita Area Technical College. In April 2012, he was involved in the Lanning shooting. In September of 2012, Williamson shot his weapon at a building, claiming that someone had pointed a gun at him from the shadows.

In July of 2013, based on the September 2012 shooting incident, Williamson was terminated from the WPD after an internal investigation found that he had engaged in misconduct including giving false information, criminal discharge of a firearm, and falsely reporting a crime.  In October 2014, Williamson was convicted of criminal damage to property and falsely reporting a crime, both misdemeanors, arising from the September 2012 incident.

Chante Newberry is an employee of the WPD. She and Williamson became "really close friends" between December of 2011 and February of 2012, and had what Newberry called an "emotional affair." They sent a lot of messages to each other including that they "loved each other," "couldn't wait to see each other," and "couldn't wait to get a hug." In mid-February 2012, Newberry's husband found out and called Williamson and told him to stay away from Newberry. In February 2012, Williamson gave Newberry a letter that she wasn't supposed to open "unless something happened and he was killed in the line of duty." In it he promised to never break her heart or abandon her and said the last words on his dying lips were her name. Newberry told Williamson in February 2012 that she wanted to work on her marriage. She spoke to him one more time at work and apologized for the way things ended, and then cut off communication. She did not speak to him again until the night of the Lanning shooting,

when Williamson called her, saying he "had told you if anything happened to me at work I would let you know, and I [was] just involved in a shooting and killed a man." Williamson began emailing her regularly after that because "he just wanted her to know he was okay." Between May and December of 2012, Newberry and Williamson rekindled their relationship and it progressed.

Right before the September 2012 shooting incident, Newberry and Williamson were texting each other. He asked if she had noticed anything about him; she responded that he had lost some weight and she was concerned about him. Shortly thereafter, Williamson texted Newberry that he had been involved in a shooting and she had "saved his life," because he looked down at her text and then looked up and saw a "guy with the rifle at the corner of the building." If she had not sent the text, he said, he might not have seen the guy and could have been shot.  Williamson later pled guilty to a charge of falsely reporting having seen a man with a rifle.

Williamson testified that the Lanning shooting triggered post-traumatic stress disorder (PTSD), and said he was diagnosed with it in September 2012. He asserted in a claim to the WPD that he has PTSD; the WPD disputed his claim.

WPD Detective Robert Chisolm was the lead investigator on the Troy Lanning shooting. His job was to conduct a criminal investigation of the shooting. As was the WPD practice, a case was opened and entered into the WPD system. Chisolm interviewed Williamson and other witnesses as part of his investigation. Chisolm concluded from his investigation that Williamson's use of force was justified.

Plaintiff's police expert, Edward "Tad" Leach, believes Chisolm did not perform a thorough and complete investigation. Leach has not reviewed any other investigations performed by Chisolm, nor has he reviewed any officer-involved shootings in the City of Wichita other than the Lanning shooting.

The Kansas Bureau of Investigations (KBI) is involved in all officer-related shootings and is considered the lead investigator in such cases. Due to the KBI's limited resources, however, most of the evidence collection in these cases is done by WPD officers.

All officer-related shootings are presented to the District Attorney's office for a determination of whether criminal charges will be filed.

The WPD's Professional Standards Unit is involved in every officer-related shooting.

WPD Regulation 4.0, "Weapons/Use of Force Requirements," as in effect on July 10, 2012, provided in pertinent part:

4.101

This regulation presents guidelines for the use of firearms and other authorized weapons. The use of firearms by law enforcement members is authorized and limited by state statute. K.S.A. 21-3215 states:

21-3215. **Law enforcement officer's use of force in making arrest.** (1) A law enforcement officer, or any person whom such officer has summoned or directed to assist in making a lawful arrest, need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest. Such officer is justified in the use of any force which such officer reasonably believes to be necessary to defend the officer's self or another from bodily harm while making the arrest. However, such officer is justified in using force likely to cause death or great bodily harm only when such officer reasonably believes that such

force is necessary to prevent death or great bodily harm to such officer or another person, or when such officer reasonably believes that such force is necessary to prevent the arrest from being defeated by resistance or escape and such officer has probable cause to believe that the person to be arrested has committed or attempted to commit a felony involving great bodily harm unless arrested without delay.

….

In a stressful situation, a police member's first reaction should be to determine whether the objective can be accomplished without the use of a weapon. A member's decision, relative to the use of force, must be legally justifiable, and thoroughly articulated, considering both the nature of the crime and circumstances surrounding the incident.

This Department recognizes and respects the value and special integrity of each human life. In vesting police members with the lawful authority to use force to protect the public welfare, a careful balancing of all human interests is required. Therefore, it is the policy of this Department that police members shall use only that force that is objectively reasonable, based on the totality of the circumstances, to effectively bring an incident under control, in making a lawful arrest, while protecting the life of the member, or the life of another person.

DISCHARGING FIREARM/USE OF LETHAL FORCE
4.104
Discharging of firearm/use of lethal force is allowed pursuant to K.S.A. 21-3215 as cited above.

UNNECESSARY EXCESSIVE FORCE
4.131
In situations, other than as a last resort, members of the Department will utilize only those weapons and defensive tactics that have been taught to them by the Training Bureau. Only such force as is objectively reasonable, based on the totality of the circumstances, to effectively bring an incident under control, in making a lawful arrest, while protecting the life of the member, or the life of another person.

A. Unnecessary use of force is strictly prohibited.

Excessive use of force is strictly prohibited. (Regulation 4.0, Revised 5/2/11 (emphasis added))

Plaintiff's expert Collin Gallagher opines that it was not reasonable for Williamson to believe that Lanning had a gun. He concedes that an officer may appropriately use deadly force when he reasonably believes that a gun is being used against him, but contends that Williamson did not have indications that Lanning had a gun.

Gallagher concedes that the WPD's use of force policy was for officers to use only reasonable force. He opines that Williamsons' use of force was not based on the policy, law or training he received. He said that WPD officers were taught at the academy that "the least amount of force necessary to affect an arrest should be the maximum amount of force utilized."

The Sedgwick County District Attorney determines whether or not to file criminal charges in an officer-related shooting in the county. As of November 7, 2014, the District Attorney's office had not closed its investigation of the Lanning shooting.

Former WPD Chief Deputy John Speer admitted that the number of police shootings in Wichita in 2012 was higher than normal for the city, and that he was concerned about it. The U.S. Attorney for Kansas spoke with Speer and expressed concern about the number of WPD shootings.

Speer admitted that officer shootings are preliminarily designated as "justifiable homicides" if it appears that the facts and law are on the officer's side, although the designation can be changed.

WPD's current policy is to perform an administrative investigation without waiting for a civil lawsuit to be resolved. Until 2013 or 2014, administrative investigations were not conducted until after civil litigation had ended.

**II. Summary of Claims and Arguments.**

Plaintiff Herington's first four claims are brought under 42 U.S.C. § 1983. Her first claim is that Williamson deprived Lanning of his constitutional right to be free from the use of excessive force because he shot and killed Lanning "without just cause or excuse, even though he was unarmed, never threatened Williamson, and was not suspected of any crime." Dkt. 145 at 13. Plaintiff next claims the City of Wichita caused the constitutional violation by being deliberately indifferent to a need for further training on the use of deadly force. Plaintiff also claims the City was deliberately indifferent to the need for further supervision of Williamson. Additionally, plaintiff contends the City caused the violation through a policy that "instructs officers to assume the worst case scenario and act on it rather than acting on the totality of the factual circumstances actually present." *Id*. at 15. Plaintiff also asserts three claims based on Kansas law, including: (1) negligent hiring, retention and supervision; (2) wrongful death (negligence); and (3) the tort of outrage.

Williamson seeks summary judgment on the following grounds. First, he contends the claims are barred by the applicable statutes of limitation. Second, he contends he is entitled to qualified immunity on the § 1983 claims. Third, as to the state law claims, he contends is entitled to immunity under the Kansas Tort Claims Act. Fourth, he contends there is no evidence that he intended to cause Lanning emotional

distress and, as such, plaintiff has no valid claim for outrage. Lastly, he contends plaintiff's claim for punitive damages fails because plaintiff has no evidence of malice.

The City's motion for summary judgment raises similar arguments, as well as asserting a lack of evidence to support the constitutional or negligence claims relating to improper training, supervision, or retention of Williamson, and the claim of an unconstitutional City policy on the use of force.

### III. Summary Judgment Standards.

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim, and an issue of fact is "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor. *Haynes v. Level 3 Communs.*, 456 F.3d 1215, 1219 (10th Cir. 2006). The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim. *Thom v. Bristol–Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). The nonmovant must then bring forth specific facts showing a genuine issue for trial. *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits — conclusory allegations alone cannot survive a motion for summary judgment. *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal–Mart Stores*, 144 F.3d 664, 670 (10th Cir. 1998)). The court views all evidence and reasonable

inferences in the light most favorable to the non-moving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

**IV. Williamson's Motion for Summary Judgment.**

1. *Statute of Limitations - § 1983 claims.* Because federal law does not have a statute of limitations for § 1983 claims, the court applies the forum state's limitation period for personal injury claims. *See Reynolds v. Wright*, 647 F.App'x  838, 840 (10th Cir. 2016).  In Kansas, that period is two years. *Id*. (citing *Brown v. Unif. Sch. Dist. 501*, 465 F.3d 1184, 1188 (10th Cir. 2006)). The court likewise borrows the state's rules for tolling the statute of limitations. *See Wallace v. Kato*, 549 U.S. 384, 394 (2007). Federal law, however, determines when a federal action based on federal law is commenced for purposes of the statute of limitations. *See West v. Conrail*, 481 U.S. 35, 39 (1987) (action not barred because it was commenced in compliance with Rule 3). Rule 3 of the Federal Rules of Civil Procedure provides that a civil action "is commenced by filing a complaint with the court." Rule 4(m) of the Federal Rules allows a 90-day period for service of the complaint after it is filed.

Lanning's shooting took place on April 1, 2012. Plaintiff's initial complaint was filed on March 28, 2014, within two years of the incident. Dkt. 1. It contained only the § 1983 claims because plaintiff was still exhausting "notice of claim" procedures on her state law claims. The initial complaint was never served on the defendants. Instead, on May 14, 2014, plaintiff filed an amended complaint (Dkt. 4) containing both the state and federal claims, and served that complaint on defendants on May 16, 2014. Dkts. 5 & 6.

The court concludes that plaintiff's § 1983 claims are timely. Plaintiff filed a complaint setting forth the § 1983 claims within the two year period. She thus "commenced" the action within the period governing the § 1983 claims. Fed. R. Civ. P. 3; *West v. Conrail*, 481 U.S. 481 U.S. 35, 39 (1987) (when the underlying cause of action is based on federal law, and the absence of an express federal statute makes it necessary to borrow a limitations period from another statute, the action is not barred if it has been timely "commenced" in compliance with Rule 3); *Green v. McKeen*, No. 12-3158-RDR, 2013 WL 1309002, at *2 (D. Kan. Mar. 29, 2013) (applying *West* rule to § 1983 claims). As plaintiff accurately points out, defendants can claim no prejudice from not being served with the initial complaint, because the amended complaint containing the same § 1983 claims was served on them within 90 days of the filing of the original complaint. *Cf. Morjaria v. Harvard Med. Associates, Inc.*, 2015 WL 3631629, at *2 (D. Ma. Mar. 20, 2015) (although there are "circumstances in which [Rule 4(m)] may be gamed or undermined," that is not the case where the amended complaint was served within the time allowed for service of the original complaint).  Under the circumstances, the court finds that the § 1983 claims are not barred by the statute of limitations.[3]

---

[3] Williamson also argues that plaintiff's amended complaint is "unlawful" because (according to him) Rule 15(a) only allows amendment as a matter of right *after* service of a complaint. Defendant cites no federal authority for this argument. As plaintiff points out, courts have construed the rule to mean that the right to amend as a matter of course terminates 21 days after service, not that the right to amend is prohibited prior to service. *See Morjaria*, at *2  (the more sensible reading is that an original complaint may be amended as a matter of right "up to" 21 days after service). *See also Nance v. Miser*, 2012 WL 3631629, at *1 (D. Az. Aug. 23, 2012) (plaintiff filed his first amended complaint prior to service of the complaint; "[a]ccordingly, Plaintiff was not required to seek leave of Court to amend."); *Green v. Southfield*, 2016 WL 692529, *4 (E.D. Mich. Feb. 22, 2016) ("The court rejects Plaintiff's assertion that Fed. R. Civ. P. 15(a)(1) requires the original complaint to be served to 'trigger' the right to file an amended complaint as a matter of course.").

2. *Qualified Immunity.*

Williamson contends he is entitled to the defense of qualified immunity on plaintiff's § 1983 claims. He contends it was reasonable to believe that Lanning was armed and dangerous, pointing out that Lanning refused to drop the bag he was carrying and allegedly "turned aggressively toward Williamson with the bag as if it contained a gun." Dkt. 154 at 32. Williamson argues that his use of deadly force was reasonable because he had an objectively reasonable belief that Lanning was armed and that he intended to fire at Williamson. Williamson argues that plaintiff cannot show that he violated Lanning's constitutional rights or that he violated clearly established law.

In response, plaintiff argues that Williamson's actions show he was either reckless or did not really believe that the bag carried by Lanning had a gun. Dkt. 163 at 37. Plaintiff argues Williamson could not have reasonably believed Lanning was involved in a drive-by shooting, that he failed to give Lanning a warning that he would use deadly force, that Lanning never had his hand in the bag and did not make any hostile motion toward him, and that Lanning never manifested any intent to harm Williamson. Plaintiff argues that Williamson's description of the shooting is contradicted by physical evidence and undermined by serious doubts about his credibility.

Plaintiff further contends that the unlawfulness of Williamson's actions was clearly established because of cases holding that an officer "cannot create the situation where force is allegedly needed and then claim the protections of qualified immunity."

Dkt. 163 at 45. Plaintiff further contends that Tenth Circuit precedent "does not allow the use of lethal force where a person is not reasonably suspected of a serious crime, was unarmed, and was not charging the officer or verbally threatening him." *Id*.

When a defendant asserts qualified immunity at the summary judgment stage, the burden shifts to the plaintiff to show that: 1) the defendant violated a constitutional right; and 2) the constitutional right was clearly established. *Keith v. Koerner*, ___F.3d___, 2016 WL 7176605, *2 (10th Cir. Dec. 9, 2016). In making these determinations, the court adopts plaintiff's version of the facts insofar as it is supported by evidence in the record. *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1318 (10th Cir. 2009).

The Supreme Court recently discussed the parameters of qualified immunity:

> The doctrine of qualified immunity shields officials from civil liability so long as their conduct "'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. ––––, ––––, 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012) (internal quotation marks and alteration omitted). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011). Put simply, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).
>
> "We have repeatedly told courts ... not to define clearly established law at a high level of generality." *al–Kidd, supra*, at 742, 131 S.Ct. 2074. The dispositive question is "whether the violative nature of *particular* conduct is clearly established." *Ibid.* (emphasis added). This inquiry "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (*per curiam* ) (quoting *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). Such specificity is especially

important in the Fourth Amendment context, where the Court has recognized that "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." 533 U.S., at 205, 121 S.Ct. 2151.

*Mullenix v. Luna*, 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015). *See also Price-Cornelison v. Brooks*, 524 F.3d 1103, 1008 (10th Cir. 2008) (for a constitutional right to be clearly established, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law the be as [plaintiff] maintains.").

Given the uncontroverted facts, Williamson could have reasonably believed that the car in which Lanning was an occupant was involved in a drive-by shooting. Dispatch reports provided grounds to believe a drive-by shooting had occurred in the neighborhood Williamson was approaching, and that a white vehicle was the apparent source of the shots. When a white SUV emerged from the same neighborhood shortly thereafter, and began to immediately flee upon being confronted by Williamson's police vehicle, the officer had reason to suspect that persons in the SUV had been involved in a drive-by shooting, despite the fact that none of the reports had yet been verified. The fact that the SUV subsequently led him on a high speed chase at speeds over 100 miles per hour only reinforced the reasonableness of such a belief, as it showed that one or more occupants of the SUV was willing to go to great lengths - including endangering the lives of everyone in the vehicle, other motorists on the roadway, and the officers who were following - to escape apprehension by the police.

After the SUV stopped and Williamson began his pursuit of Lanning on foot, he was aware that Lanning was carrying a bag as he fled and that the bag made a "thunk" as it hit against a wood fence that Lanning climbed over. Lanning obviously knew he was being pursued by a police officer at that point but nevertheless continued to flee and subsequently disregarded or disobeyed Williamson's orders to stop and "drop it" or "get down." At that point, Williamson had reasonable grounds to suspect that Lanning was involved in a drive-by shooting, that he was attempting to flee from the police, that the bag he was carrying possibly contained a firearm; and that Lanning was willing to disregard a clear order to drop the bag or get on the ground despite being confronted at close quarters by a police officer. A reasonable officer confronted with such circumstances could clearly have a reasonable concern that the individual was armed with a gun and may be willing to forcefully resist the officer's attempts to apprehend him.

Plaintiff has pointed to some physical evidence calling into question various aspects of Williamson's version of the shooting, including Williamson's impression that Lanning never faced him directly, his belief that he (Williamson) did not move during the shooting, and the assertion that Lanning had his hand inside the bag when he spun around. But plaintiff cites nothing, aside from speculation, to suggest that Williamson did not perceive that Lanning was spinning around and raising the bag toward him at the time of the shooting, or that Williamson could not have reasonably interpreted Lanning's actions as an attempt to use a firearm against him. Williamson had reasonable grounds to *suspect* that Lanning was attempting to use a gun, although he

had no confirmation that Lanning in fact had a gun. At that moment, Williamson had to decide whether to employ deadly force or wait and see if Lanning was in fact attempting to fire a gun. Williamson had no more than a second to make that life-altering decision.

For purposes of summary judgment, plaintiff has cited evidence from which a jury could reasonably find that Williamson violated Lanning's Fourth Amendment rights by using excessive force. But to defeat qualified immunity, plaintiff must also show that Williamson's conduct was contrary to clearly established law, as judged against the particular facts of the case. *Mullenix, supra.* And plaintiff fails to cite any case law putting Williamson on clear notice that using deadly force in those circumstances was a violation of Lanning's rights. Plaintiff cites several cases, including *Allen v. Muskogee, Okl.*, 119 F.3d 837 (10th Cir. 1997), for the proposition that an officer may not recklessly create the need to use deadly force. Dkt. 163 at 45. But *Allen* involved an attempt by an officer to grab a gun from the hand of a suicidal individual. A second case cited by plaintiff, *Sevier v. City of Lawrence, Kan.*, 60 F.3d 695 (10th Cir. 1995), similarly found a potential Fourth Amendment violation where officers shot a suicidal individual who was allegedly holding a knife at his side, without an immediate threat to the officers. *Id.* at 698. Plaintiff's third case, *Hastings v. Barnes*, 252 F.App'x 197, 2007 WL 3046321 (10th Cir. 2007), also involved pursuit of a suicidal individual who "was not a criminal suspect," and who "was contemplating suicide by asphyxiation, was non-violent and was not known to be armed." *Id.* at 199. None of these establish that it was a clear violation of the Fourth Amendment for Williamson to pursue or confront a

fleeing criminal suspect whom he reasonably suspected to be armed, or to use deadly force when the suspect disregarded an order and instead appeared to raise a bag possibly containing a firearm at the officer.

Plaintiff's other argument that Williamson violated clearly established law asserts that the officer should have known that Tenth Circuit precedent "does not allow the use of lethal force where a person is not reasonably suspected of a serious crime, is unarmed, and was not charging the officer or verbally threatening him." Dkt. 163 at 45. He cites two cases in support: *Zuchel v. City & County of Denver*, 997 F.2d 730 (10th Cir. 1993) and *Walker v. City of Orem*, 451 F.3d 1139 (10th Cir. 2006). Neither of these cases establishes that Williamson's conduct violated clearly established law. *Zuchel* involved the shooting of a man who created a restaurant disturbance and was then encountered by police on the street arguing with some teenagers. Although one of the teenagers indicated to police that the man had a knife, witnesses testified that at the time the officer shot the man, the man's hands were up in the air, he did not charge the officer, and "they were so far apart … there was no one in danger at that time." *Id*. at 736. The *Walker* case involved facts closer to the instant one, in that an officer claimed he thought a knife in an individual's hand was actually a gun, but in that case the "angle of [the individual's] hands and the amount of light on the scene should have permitted [the officer] to ascertain that [the individual] was not holding a gun in a shooting stance," and moreover the man "was not actively resisting arrest, and there was no need to use deadly force to prevent him from fleeing and possibly harming others." 451 F.3d at 1160.   The *Walker* court decision was based on the principle that it was "specifically

established that where an officer had reason to believe that a suspect was only holding a knife, not a gun, and the suspect was not charging the officer and made no slicing or stabbing motions toward him, that it was unreasonable to use deadly force against the suspect." *Id.* (*citing Zuchel*, 997 F.3d at 735-36).

In contrast with these cases, the officer here was in hot pursuit of a suspect shortly after a reported shooting; the suspect fled on foot following a dangerous high speed chase; the suspect carried a bag containing something heavy; the suspect disobeyed the officer's command to drop what he was carrying or get on the ground; and the suspect started turning toward the officer and raised the bag in his hands to a position from which he could have been attempting to fire a gun at the officer. Plaintiff's burden in responding to a qualified immunity defense is to identify clearly established law that the officer violated. "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.' " *Mullenix*, 136 S.Ct. at 308 (quoting *Reichle v. Howards*, ––– U.S. ––––, 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012)). Plaintiff has failed to meet that burden, and Williamson is accordingly entitled to summary judgment on plaintiff's § 1983 claims against him.

### V. City's Motion for Summary Judgment.

1. <u>§ 1983 Claims</u>. The City argues it is entitled to summary judgment on plaintiff's § 1983 claims for various reasons, including the following. As to Count 2, which alleges a constitutional violation resulting from the City's alleged failure to properly train officers on the use of force, the City argues among other things that

plaintiff has no evidence of deficiencies in the City's training, no evidence that the City was deliberately indifferent to a need for further training, and no evidence that a lack of training was the moving force behind the shooting of Lanning. Dkt. 151 at 34-35.  It makes similar arguments with respect to Count 3, which alleges a constitutional violation arising from a failure to supervise Lanning despite "knowledge of his mental health issues and previous shooting incidents," which "directly led to the shooting of Troy Lanning," and allowing "an atmosphere where officer shootings are not properly investigated," as a result of which Lanning was killed. Dkt. 145 at 14-15. Finally, the City contends it is entitled to summary judgment on Count 4, which alleges the City had an unconstitutional policy of instructing officers "to assume the worst case scenario and act on it rather than acting on the totality of the factual circumstances actually present." Dkt. 145 at 15.

Plaintiff's response brief does not address the City's arguments with respect to her failure to train claim (Count 2) or the claim of an unconstitutional use of force policy (Count 4), with exception of passing (and unexplained) references. *See* Dkt. 167 at 52-53 ("The enormous number of shootings by the Wichita Police Department is extremely abnormal for a city the size of Wichita and shows the failure to train and the unconstitutional policy."). Plaintiff has failed to even explain these claims, let alone cite valid and probative evidence to support them.  Summary judgment is accordingly granted to the City as to Counts 2 and 4.

With respect to the claim that the City's failure to supervise Williamson or other officers led to the constitutional violation (Count 3), a review of the elements of such a

claim shows that the City is likewise entitled to summary judgment. A municipality may not be held liable under § 1983 for a constitutional violation merely because it employed the tortfeasor. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) ("*Respondeat superior* or vicarious liability will not attach under § 1983"). Rather, a plaintiff must show the existence of a municipal policy or custom, and a direct causal link between the policy or custom and the injury. *See Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010). Such a policy may take the form of a failure to supervise employees "so long as that failure results from 'deliberate indifference' to the injuries that may be caused." *Bryson*, 627 F.3d at 788. *See also City of Canton*, 489 U.S. at 389 ("Only where a municipality's failure to train its employees in a relevant respect evidences a deliberate indifference' to the rights of its inhabitants can such a shortcoming be property thought of as a city 'policy or custom' that is actionable under § 1983"). Such deliberate indifference may be shown by proving the existence of a pattern of tortious conduct that put the City on notice of the need for further supervision, or by a showing that the violation was a highly predictable or plainly obvious consequence of the City's failure to supervise. *See Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 771 (10th Cir. 2013) (citations omitted).

Plaintiff fails to cite any evidence that could show the City's failure to supervise Williamson or others evinced deliberate indifference to the rights of the City's inhabitants. Nor does she cite evidence that such a failure was a cause of the Lanning shooting. In support of the claim, plaintiff relies primarily on FBI crime statistics that purportedly show Wichita had a high rate of police shootings in 2011, as compared to

29

certain other cities. Dkt. 167 at 52-53. It is not entirely clear what plaintiff is arguing the statistics show with respect to City of Wichita's training or supervision. What is clear is that plaintiff has cited no evidence of a high rate of improper or unjustified use of deadly force by WPD officers prior to the Lanning shooting, such as would have put the City on notice that its training or supervision concerning the use of deadly force was inadequate.

### VI. State Law Claims.

The parties raise extensive arguments pertaining to plaintiff's state law claims, including claims of immunity under the Kansas Tort Claims Act. The court has pendent jurisdiction to hear these claims because they were joined with plaintiff's federal claims. 28 U.S.C. § 1367(a). With the dismissal of all of plaintiff's federal claims, however, the court has discretion to decline to exercise jurisdiction over the state law claims. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim … if the district court has dismissed all claims over which it has original jurisdiction").

Having considered the nature of the state law claims and the circumstances of the litigation, the court concludes that plaintiff's state law claims should be dismissed without prejudice. *See Brooks v. Gaenzle*, 614 F.3d 1213, 1229 (10th Cir. 2010) (where federal claims are dismissed before trial, leaving only issues of state law, the federal court should ordinarily decline to exercise supplemental jurisdiction). As this court has previously noted, *Enneking v. Univ. Nat. Bank*, No. 13-4070-JTM, 2013 WL 6804258, at *8 (D. Kan. Dec. 23, 2013), "[i]f federal claims are dismissed before trial, leaving only issues

30

of state law, 'the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.'"

**IT IS THEREFORE ORDERED** this 9th day of January, 2017, that plaintiff's claims against Randy Williamson and the City of Wichita under 42 U.S.C. § 1983 (Counts 1-4)) are hereby dismissed on the merits, with plaintiff to take nothing on those claims; and

**IT IS FURTHER ORDERED** that plaintiff's claims against Randy Williamson and the City of Wichita arising under Kansas law (Counts 4-7) are hereby dismissed without prejudice.

_____s/ J. Thomas Marten_____
J. THOMAS MARTEN, JUDGE